Good morning. May it please the court, my name is Alton Burkhalter and along with my co-counsel Ross Lockwood, we represent the plaintiff and the appellants in this case, Sam DeSantis and ATEF Ted Iwata. And Mr. DeSantis and Mr. Iwata are in court this morning. I intend to focus my limited time this morning on the issues that the trial court used to grant the alternative motion for summary judgment. I note that in GM's papers they raised some other summary judgment motion that was denied, and it's not my intention to focus on that. However, if the court intends to direct some questions about that other motion, Ms. Lockwood is prepared to do that and I'll reserve some time for her to take that issue up. I'd also like to reserve three minutes, if I could, for rebuttal. This is a de novo review of the district court's granting of GM's alternative motion for summary judgment. In the case of the Claremont case, the general legal principles set forth in the Claremont case apply. That is, a manufacturer can't rely on unreasonable criteria in rejecting a proposed assignee. The Claremont case also provides, importantly, that when a manufacturer's evidence is shown to relate to unreasonable criteria or shown to be inaccurate, it is properly rejected. Now, the court below granted summary judgment on two bases. The first one was that the appellants were materially deficient in respect to their customer satisfaction index, and I'm going to call that CSI scores. And the second is that DeSantis borrowed $187,000 of his equity investment, making it such that his investment wasn't, quote, unencumbered funds, close quote. In the interest of time, I'd like to talk first about this issue of the unencumbered funds, because in reviewing the record, I found some additional evidence that I'd like to make sure the court is aware of. But let's start with the premise that the record showed this. Ted Iwata had agreed to gift Sam DeSantis whatever amount GM required of Mr. DeSantis over and above the $187,000 investment in order for Mr. DeSantis to meet GM's, quote, capital requirement. And Mr. Iwata had the financial resources to do so. The record indicates that Mr. Iwata had a net worth of approximately $2.1 million, and the sum total of his encumbrances were about $200,000 on his house. And Mr. Iwata told General Motors this in writing. Was it appropriate under these circumstances for the court below to find that General Motors was reasonable to ignore this irrefutable evidence? Or should the court below have noted that this was an issue that dealt with a trier of fact needing to hear and determine if GM was acting reasonably under those circumstances? Was there any issue as to whether the $187,500 that Mr. DeSantis had was not itself borrowed? It was borrowed initially, and that brings an important point, Your Honor. I found in the record at Exhibit 67, found at page 1086 of the appendix, an email from Mr. DeSantis. And Mr. DeSantis sent this right after the meeting in which the GM representatives raised this question of where the source of his equity investment had come from. And so in this email, Mr. DeSantis indicates that he's going to sell his home so that he can be closer to the dealership. And as a result of that, he's going to pay off that home equity line of credit, which represented about $100,000 of the $187,000 investment. But at the time that they're reviewing the application, no matter how much money Mr. Iwata is willing to put in without strings, Mr. DeSantis' contribution is encumbered. It was encumbered at that time. And I think the critical distinction here is when Mr. DeSantis came upon this opportunity, the dealership was on its deathbed. The lines of credit had been frozen. It was in technical default of its dealer agreement with Chevrolet, and fast action was required. This isn't a circumstance where Mr. DeSantis didn't intend to comply with the General Motors requirements, because as he indicated in this email, and I'm just going to refer to it shorthand as Exhibit 67, he indicated that in selling his house, he would remove the encumbrance of the $100,000 for the $187,000, such that that wouldn't be a problem moving forward. Your Honor, you're absolutely correct that at the time he invested those funds, he went to his most liquid source of funds, which was the home equity line of credit. But he indicated to GM that he intended to sell his home, take that cash, pay down that line of credit. And the other interesting thing is that Mr. DeSantis' personal financial statement, which is shown in the confidential filing at Exhibit 13, page 328, shows that Mr. DeSantis had about $250,000 of extra equity in his home, that upon selling his home, he would have had not only the line of credit retired, but an additional $250,000. And so under those circumstances, was it reasonable for General Motors to say, well, we're not going to look further than your answer that these funds were borrowed. We're not going to go any further than that. But we're kind of in a funny spot here. This is not your typical summary judgment motion. We're looking at, is there an issue of fact? We're asking ourselves, is there substantial evidence that supports a permissible criterion on the part of GM? So there is evidence that as of January 2005, or whenever we're talking about, Mr. DeSantis' funds were encumbered. So are you saying that as a matter of law, it was unreasonable for GM to say, well, you know, we don't want to wait and see what happens when you sell your house and do these other financial things? We're looking at who you are today, and we're looking at the performance of the dealership, and frankly, we just aren't interested. I mean, if there's substantial evidence of that, aren't we done? With all due respect, Your Honor, appellants don't believe so. Okay. And the other point is that when Mr. Iwata wrote General Motors, he said, and that's in the record as well, I'm prepared to gift any amount that's necessary to get Sam DeSantis approved. And so if General Motors said, well, you can't take any credit for this $187,000, I believe you can infer from that writing that Mr. DeSantis, excuse me, that Mr. Iwata provided to General Motors that Mr. Iwata was prepared and had the financial wherewithal to make sure that Mr. DeSantis' capital contributions met General Motors' requirements. And so we have that record. And the trial court didn't dispute that. What the trial court said was, well, General Motors was reasonable in not believing that. And I believe that that's a question, you know, here we're putting on trial reasonableness, and we're dealing with some facts that cut both ways, and certainly the undisputed fact is that Mr. DeSantis' partner was prepared to pony up whatever amounts were necessary to get this deal approved, and he had the financial wherewithal to do it. So under that circumstances, are we appropriate in granting summary judgment? Appellants think that was a bit premature, and that a trier of facts should have had the opportunity to vet those issues, to determine if it was unbelievable or uncredible that Mr. Iwata would do this in light of the facts and circumstances of this case. So that's my point about the issue of the borrowed funds. I'd like the court to consider the e-mail, and I'd like the court to consider the letter that Mr. Iwata had provided to General Motors that was unequivocal. I'd like to now turn to the issue of the CSI scores, which was the other reason that the trial court granted the alternative summary judgment motion. And, Your Honors, I want to start by saying this. In the abstract, appellants agree that CSI scores are a reasonable measure to evaluate a dealer candidate. In the abstract. However, in this case, we're dealing with an extreme circumstance. Mr. DeSantis had come upon this dealership that was literally on its deathbed. The line of credit that allowed the company to do business, the veritable lifeblood of the business, had been frozen. It was in default of its dealer agreement. Key employees had left. The inventory that was on the ground was stale and not really sellable. I mean, when you look at this, this is a triage situation where, you know, it's probably impossible to take care of every problem there in short order. And so Mr. DeSantis and Mr. Iwata had the tough decision of what do you do first to save the patient? And so the record notes that among the first things that Mr. DeSantis and Mr. Iwata did was they pulled out their wallet and they wrote a check for $650,000 so that that line of credit could be freed up. And that process took a couple of months, but they were back in business. And you'll see in the record, I'd like to refer the court to, it was the last site in the record many times in our brief, but it was at the pages 1094 and 1095, a chart prepared by General Motors that shows a trend of the CSI scores increasing. And then in the fall, you'll notice General Motors Acceptance Corporation again froze a line of credit and those scores dropped again and then they start rising again. And they rise precipitously. And in fact, the last two reporting dates that we have show that the dealership was above the region average. So under those circumstances, we believe that the criteria, while in the abstract is an appropriate criteria, was not reasonable to be applied in this situation for these reasons. It was impossible for Mr. DeSantis to be able to demonstrate his ability as a good dealer in that short period of time with all of these other operational and financial issues confronting him, some of which he could control and many of which he couldn't. More importantly, when General Motors rejected the application in the CSI, included the scores that were two years old and in many cases, one year old. And in fact, virtually all of the scores that General Motors relied upon dealt with time periods that Mr. Iwata and Mr. DeSantis weren't there. So they were being punished for performance that they had nothing to do with. They weren't involved with. You know, when you go back and you look at the Claremont case, in that case General Motors won a decision based on CSI. And appellants proposed that that application is actually the way the court should have looked at this situation, which was in that case Mr. Worthington had applied to buy the General Motors franchises and General Motors looked at Mr. Worthington's ongoing activities in his other dealerships. Those were normalized activities. And there was no excuse for the fact that Mr. Worthington had total control, he was the owner, had owned these businesses for a lengthy period of time and had been unable to demonstrate adequate customer satisfaction. In this particular case, Mr. DeSantis could show that separate and apart from this crisis that he was involved in with the Sunset Auto Plaza, he had over 30 years of running dealerships or assisting and running General Motors dealerships with an outstanding record. And in fact, if the court would refer to his rebuttal letter, and that appeared in volume four at pages 879 to 884, Mr. DeSantis outlined an outstanding record of outstanding customer service at all of the other dealerships that he had operated. So the standard applying CSI to evaluate a dealer candidate is appropriate. But under these circumstances, limiting it to simply four or five months, when in most of those months the line of credit had been frozen and there were huge other operational and financial issues, wasn't a reasonable application of that standard. Let me just tell you what's bothering me about this case, sort of in the big picture. Does any applicant for a motor vehicle dealer franchise have any vested right to get that franchise? No. There are no vested rights. All right. So you're there. There might be other applicants. The franchisor may have other people that they're considering as well. So clearly, if you turn somebody down because, you know, you don't like what they look like or their race or ethnicity or something like that, you're violating the law. If you turn somebody down, and this is what Claremont stands for, on the basis of evidence which is simply irrelevant or concocted, that's not okay either. But as long as it's an honest business decision, you're looking at all of the factors, I mean, don't they get a lot of deference? They do get a lot of deference when they're applying an appropriate standard and using accurate information. But you don't, in order to decide that, look at every single piece of evidence they consider and say, you know, I can dispute this or I can disagree with that. The question is, it's a substantial evidence standard. Is there something in the record which makes this a reasonable exercise of business judgment? Right. And so we look at the standard. General Motors said, we're going to reject you among other reasons because your CSI scores are too low. And then it cites to a record a history that didn't include these folks operating that dealership. Under the Claremont case, that is prima facie violation of the duty of the manufacturer to provide reasonable grounds for this rejection. And so I think the court really needs not go any farther than say it was inappropriate for the trial court to grant summary judgment in light of the fact that the stated basis proposed by General Motors to reject the applicants was inaccurate data. Well, it does include the CSI data was relying on at least one report that included a period in which your clients were operating. That's correct. There was a short period of time. I disagree that the inference is that the performance was declining. And I would refer the court to the pages 1094 and 1095 of the record because there's a chart there that does show trends in customer satisfaction. And the way I read it, it shows that there was a deep decline in the few months before DeSantis took over the operations. And then it begins to climb. The line of credit is frozen again. It drops. And then it begins to climb again. It climbs significantly to the point where it's above the region average. So you're using all of your time, so I don't know. Thank you. I'll step down and save the balance for rebuttal. May it please the Court. Greg Osprey for General Motors. Picking up on Judge Fogel's point, I'd love the court to write an opinion to clear up this whole area of the law that we tried to raise in our original summary judgment motion that Judge Liu denied. But I'm not going to address that again unless your honors feel it's necessary. As a preliminary matter, after the briefs were filed in this case, the California Court of Appeal in a case called Flatibow v. American Zuzu Motors adopted the Claremont and Van Ness standard, and that's at 150 Calab 442. So there's no question under California law what the standard is. I'd like to also agree with Mr. Burkhalter that there is a requirement that the criteria applied be reasonable. Here I think it's absolutely clear that capitalization concerns are appropriate criteria. Justice Breyer's decision on the First Circuit for Pioneer Ford says that. The RBB decision of this Court says that. What troubles me, I don't disagree with that as a proposition, but what troubles me is that it wasn't listed on the turndown letter as a reason. The turndown letter was not a model of perfection, Your Honor. The record is clear, though, that this decision was made in the field by the zone manager, Mr. Botsford, and his superior, the regional sales manager, Mr. Williams. And it's clear that the financial concern was a major issue, and in fact Mr. DeSantis, as explained in Mr. DeSantis, and Mr. DeSantis in his letter in January, acknowledges that. The turndown letter was written by a central organization in Detroit. There was a miscommunication. There were lots of things that were wrong with that letter. That doesn't detract from the fact that there is substantial evidence on both the CSI front, which I'll come to in a moment, and the capitalization front for turning down this application. No, I mean, the application of the summary judgment standard to the, what is it, Claremont standard is a little tricky, because it's whether or not a genuine issue of material fact exists as to whether substantial evidence of a material deficiency in a performance related criteria existed, so as to render the turndown decision reasonable. Right. So we're applying a, is there any issue standard to a, we've got a, there's got to be a showing of substantial evidence. I'm sorry, I didn't catch your last words. So there's got to be a showing of substantial evidence, and we're applying the summary judgment standard to it, whether there's any genuine issue of material fact as to whether substantial evidence exists. Yes, Your Honor. It's kind of a tricky standard. Well, actually, if you look at Anderson v. Liberty Lobby, Your Honor, which was the Supreme Court decision on the summary judgment standard, there there was a different, there was a different, there was a different, it was clear and convincing. And what the Supreme Court said in that case is you have to apply the summary judgment notion, or the summary judgment standard, through the prism of the standard of review. So what that means in this case is that is there's, we get summary judgment unless he shows that there isn't substantial evidence to support the reasonableness of the decision. I think that's how the standard works. And in, on the capitalization, you're saying that although it's not in the turndown letter, it's all over the record in other, in other places. It is all over the record, Your Honor. The other issue I wanted to come to was the one that Judge Liu raised, which was, okay, here's this gift. And Mr. Burkhalter this morning said, well, Mr. Iwata would have been able to, would have been willing to make that gift even more. But that sort of defeats the purpose of having the dealer operator, the person who's going to run this dealership, have an investment of his own unencumbered money in this dealership. And it's a reasonable exercise of business judgment for GM to look through the form gift of that amount of money and to see that someone who is not the dealer operator is essentially supplying the dealer operator. Can I just pursue that? Because I was going to ask you that question if you hadn't brought it up. So Mr. Iwata was willing to give Mr. DeSantis anything Mr. DeSantis needed to satisfy the personal investment criterion. And you're saying it was permissible for GM to say that's not good enough. It's not really Mr. DeSantis' money. And we want the person with the dealership experience who is Mr. DeSantis to put his own money in there so we can look through this. Even if it is a gift, it doesn't achieve the policy objective. And was that fully developed in the record, that particular argument? I'm not sure what Your Honor means by that. Well, what I mean is, is that something that was argued before the district court and everybody had a chance to be heard on? I don't believe that argument was emphasized in the same way that it was here this morning. Similarly with Mr. DeSantis' claim way after he was turned down that he'd sell his house to get the money. So those were sort of two sides. I think if you look in the record, you find that both of those things came up after the initial turndown of the October 29 application was given. Well, I just mean, was it something that was before the district court? Yes. Both the concern that GM had about waiting to see whether Mr. DeSantis could remove his indebtedness and his concern about the gift. That's in the record that was before Judge Lew. As to the gift, certainly. As to the I'm going to sell my house, as I say, if I didn't hear that for the first time here this morning, I didn't hear it with the same forcefulness as was presented this morning. I wanted to say one other thing, too, about the gift. Mr. Iwata did indeed provide a financial statement that showed a lot of money, most of which was in real estate. There was no competent evidence below what that real estate was really worth. So when Mr. Burkholder comes in and says, well, Mr. Iwata would have given Mr. DeSantis unlimited funds, there's a missing link there. And I'd again say that the idea of giving someone $300,000 or more to satisfy their personal investment requirements is sort of like an oxymoron. So you're saying it's not just that it was that he had encumbered funds. It was that even if it was a gift and you believe that it was a gift, he did not own it personally at the time. Well, that's right, John. I was coming from someone else. The concern here, just to make sure the panel understands, the concern here is General Motors doesn't want to approve someone who essentially is a straw purchaser. I mean, you can think of all kinds of mischief. You know, someone comes in and says, I'm a general sales manager at a Cadillac store and I want to buy this store and here's my $187,000 that I borrowed. But that doesn't matter because this guy here who has no automotive experience, who you don't know anything about how many I want. Okay, so now we have the first turndown in business. And all of a sudden, Mr. Big Buck says, well, you know, Mr. DeSantis, you're really not doing a very good job. I'm going to boot you out. Okay, so now we have, forced upon us as General Motors, someone who assumes the role of a dealer operator who has no automotive experience whatsoever. In fact, the reason for the gift stated in the paperwork was Mr. Awadis says, I'm going to give Mr. DeSantis this gift so he can train me in the automobile business. I mean, that's just, you know, beyond pale. The other thing I wanted to emphasize, maybe I already said this, the one, the I'm going to sell my house to raise the money, monetize all my assets. I believe if you look at the record reference that Mr. Burkhalter mentioned, I think he actually cited it on the wrong there is somewhere in the record a statement by Mr. DeSantis that he is willing to sell his house to get at least some additional money. I believe that occurred in January after the decision had been made. Turning to CSI, I wanted to first point out that this trend document that Mr. Burkhalter mentioned, if you look at it, it's, as he said, 1094 of the record. You have to be careful looking at these figures, because as the appellants themselves have pointed out, there's about a three-month time lag. So if you look at this, you see that indeed the CSI is going up by report month until about August. But that really relates to a period in which the date of time before Mr. DeSantis was there. What you really have to look at is the November, because that goes back to June, July, and August. And that is almost the lowest point on this entire chart. Now, after that, of course, the CSI goes up. But General Motors didn't know that when it made the decision in December. As Judge Liu pointed out, the relevant CSI figures are those immediately before the decision. And if you look at the CSI figures that are in Mr. Botsford's chart, I think it's at, actually, for record, 398. If you look at the November figures of the dealership for CSI, sales CSI, which would correspond to Mr. DeSantis operating the dealership, June, July, and August, we see that his score is 57.8. A year before that, Mr. Coletto, who wasn't a good operator, for that same month, had a score, a three-month score, of 77.8. That's a 20-point difference. If you compare it, the 12-month scores, 59 versus 76.5 a year earlier, and 20 points below the regional average. And in Claremont, of course, it was held that a 15 percent deficiency was a sufficient basis to uphold the term down. And it is those figures that belie what Mr. Burkhalter told you here this morning about Mr. DeSantis being punished for stuff he wasn't involved in. Now, the term down letter itself did include some prior period CSI scores. But, of course, those show precisely the comparison that I just spoke about. When Mr. DeSantis arrived on the scene, he not only didn't turn the CSI around, it got worse. Fortifying GM's decision, he was not the person to turn around this struggling dealership, even if he had the money, which, of course, he didn't. When did Mr. DeSantis arrive on the scene? May of 2004. I think it was May 26th, Your Honor. And he continued to operate the dealership thereafter until the Legio transaction went through in the first part of 2005. I don't think I have anything else in response to the points that Mr. Burkhalter raised, but obviously if the panel has other questions, I'd be pleased to answer them. With my 32 seconds, I'd like to just direct the Court. The email that I referred to was only, it's page 1056 of the record, and it was on January 7th, which was only two days after Mr. DeSantis learned of this issue about capitalization that wasn't set forth in the turn down letter. With respect to CSI, I'd direct the Court's attention to the record at page 1085, 1086, and 1087. And these are, again, GM reports during Mr. DeSantis' time that show excellent CSI scores, and if you compare the three months to the 12 months, you'll see significant improvement. That's my time, and I appreciate the Court's allowing me to have it. Thank you. Thank you very much. DeSantis v. GMC is submitted, and the Court will adjourn this session.
judges: Wardlaw, Ikuta, Fogel